REID, Judge.
This is a suit brought by Arkansas Frozen Foods, Inc., as the actual. owner, and ■Citizens National Bank in Hammond, as the named owner in accordance with warehouse receipts, for damages to merchandise allegedly destroyed or damaged while in Your Food Processing and Warehouse Corporation’s cold storage warehouse, in the amount of $21,285.87, together with 12% penalty and $5,000.00 attorney’s fees.
Suit was instituted against Your Food Processing and Warehouse Corporation and its alleged insurer, Lloyd’s of London. In defendant Lloyd’s of London’s answer, however, it is alleged the real insurer was W. Tolson, appearing on his own behalf and on behalf of all other subscribing underwriters to certain certificates of insurance issued to Your Food Processing and Warehouse Corporation.
Arkansas Frozen Foods, a processor of •frozen sweet potatoes (yams) under Lido, Bel Air and other brand names, alleged it had stored during February 1960 approximately 8,694 cases of frozen yams in the defendant’s warehouse and on June 14, 1960, when petitioner withdrew 1,980 cases, the said merchandise was found to be damaged and unmarketable as evidenced by a syrupy condition due to previous thawing, and further alleged approximately 25 to 30 per cent of the cases were in a crushed or mashed condition. The remaining 6,716 cases were still stored in defendant’s warehouse at the time of the trial. The plaintiff Arkansas Frozen Foods, Incorporated further alleged under its contract with the defendant warehouse, and under the Louisiana Warehouse Act the defendant was obligated to maintain these perishables at zero degree Fahrenheit, but in violation of the contract and the law defendant permitted variations in temperature higher than zero degree which caused condensation within the packages of stored merchandise resulting in melting of the sugar mix and spoilage of said perishables, rendering them unsalable and unmarketable.
Plaintiff also pleads the doctrine of res ipsa loquitur on the grounds the defendant, Your Food Processing and Warehouse Corporation, had exclusive control of the stored goods and in the ordinary course of due care in storing, the said goods could not have been damaged or thawed without the negligent operation of the warehouse.
The defendant warehouse denied it was negligent or that any contract was entered into concerning zero degree temperature, and alleged the issued warehouse receipt clearly limited its liability to reasonable care and diligence and perishable goods were accepted only at the owner’s risk and the warehouseman would not be liable for loss resulting from change in temperature or humidity through cooling, freezing, storing or removing merchandise from storage. The defendant further alleged plaintiff Arkansas Frozen Foods, Inc., having no interest in the matter, had no' standing to bring this suit because the warehouse receipt was issued in the name of the Citizens National Bank of Hammond, the First National Bank in Little Rock, and Morton’s Frozen Foods; furthermore plaintiff Citizens National Bank in Hammond could not bring the suit because the warehouse receipt was not issued in its name alone. The defendant warehouse reconvened for storage costs in the amount of $3,022.80 up to September 15, 1961, and for additional storage costs due for the goods then stored with it until such time as the goods were removed.
After the filing of the petition, counsel for plaintiff filed a motion asking for a substitution of Plammond Foods, Inc., a *255 Louisiana corporation, as a party plaintiff in the place of Arkansas Frozen Foods, Inc., since Hammond Foods, Inc., had succeeded to all rights of Arkansas Frozen Foods, Inc.
For written reasons assigned, the Trial Judge rendered judgment in favor of the defendant, Your Food Processing and Warehouse Corporation, plaintiff in re-convention, for the amount of its claimed storage and for storage at the rate of $157.62 each month from September 15, 1961 until paid and until the remaining merchandise was removed from defendant’s warehouse, and dismissed plaintiff’s suit. It is from said judgment that this appeal has been taken.
In reaching his decision the Trial Judge had to pass on three main questions of fact; first, whether or not plaintiff’s yams were unmarketable and represented a total loss because of the alleged damage; second, whether or not the plaintiff had contracted for zero degree temperature either by request or by formal contract; and third, if there had not been a contract either by request or by formal contract for zero degree temperature, whether or not the defendant was guilty of any lack of ordinary care which would be the duty owed by a warehouseman in the absence of any special storage contract.
With regard to the first question, it is clear according to the record the goods were unmarketable and represented a total loss. The unmarketability of the yams was not due to spoilage from a health standpoint, but rather unpalatability due to a cardboard-like flavor.
Mr. Vergil Don Ruble, a control inspector for Safeway Stores, Inc. testified his company would not accept the merchandise in question Plaintiff filed a letter from Mr. Ruble rejecting a portion of the yams in question and a letter from the Safeway manager asking Arkansas Foods Inc. to be certain none of the damaged yams still had Safeway labels.
Mr. Earl F. Burk, a representative of the United States Department of Agriculture, Agricultural Marketing Service, Processed Fruit and Vegetable Section, testified the Service found the flavor to-be of varying degrees of intensity of cardboard-like flavor, and graded the produce as substandard on account of flavor. He further stated it was of low quality, but edible.
It is clear, therefore the Trial Judge was correct in holding that the merchandise sued upon was unmarketable.
Before discussing the second factual question mentioned, it should be mentioned the particular product at issue was a unique patented product, different from the other types of yams stored in defendant’s warehouse. The Trial Judge described the process thus:
“The voluminous facts establish that Arkansas Frozen Foods operate a food processing plant in Hammond, Louisiana, where frozen yam sweet potatoes are processed. This is a patented procedure which includes heating the yam to a temperature of 212 degrees, cooling, adding of a special sugar ingredient, boxing into small containers, quick freezing the yam and packing a quantity of the containers into large cardboard cases for marketing or storage. The small containers representing the individual retail wrapping consists of aluminum foil on the bottom and all sides of the yam. Thereafter the top, which is not enclosed by foil, is covered by a cardboard wrap. These small containers when packed into the cardboard cases are turned upside down apparently for the purpose of sticking the glue used to close same. In such position the frozen yam lies directly on top of the cardboard wrap. The cases are then stacked upside down on pallets for storage in Hammond Warehouse — an owned subsidiary of plaintiff, Arkansas Frozen Foods, Inc.
*256 “Mr. Warren, officer of the plaintiff Arkansas Frozen Foods, described in detail the patented process by which Arkansas Frozen yams are manufactured. The plaintiff’s process differs from other producers in that the added sugar is described as an ‘invert sugar’ which is in a dry or powdered state in the frozen state but becomes sirupy upon heating. Considerable testimony was adduced that this invert sugar was sensitive to temperature abuse i. e. becomes mushy or sirupy if the storage temperature is not retained constant at a temperature of zero degrees or lower. Further that this mushy state would be triggered by the storage temperature rising above zero below freezing at say even 10 degrees above zero. Once the frozen yam product has been subjected to temperature abuse I. e. the invert sugar being triggered into the sirupy condition, the yam color changes, even the container may become discolored and the product is unmarketable to the consumer.”
It is because of the characteristic of the product as described above that the question becomes important as to whether or not zero degree storage was contracted for or requested, and, if not directly contracted for, whether or not plaintiff informed the defendant of the unique character of the product and the requirement that it be stored at zero' degree temperature. It should be pointed out here in the ordinary course of events the product, after being frozen, would be stored at the Hammond Warehouse, a subsidiary of the plaintiff, but due to a shortage of storage space, these particular yams were stored at defendant’s plant approximately six miles from plaintiff’s plant. The record is clear there was no written contract entered into between plaintiff and defendant in regard to zero degree temperature. In fact the only written document pertinent to the issue is the warehouse receipt issued by the defendant at the time the yams were stored, which warehouse receipt completely negates any agreement or guarantee on the part of the defendant that zero degree storage would be maintained. The pertinent part of this warehouse receipt reads as follows:
“Terms and Conditions of the Warehouse Receipt of Your Food Processing and Warehouse Corporation
“LIABILITY — Sec. 10 (a) The responsibility of a warehouseman, in the absence of written provisions, is the reasonable care and diligence required by law.
“(b) Perishable goods, or goods which are susceptible to damage through temperature changes or other causes incident to storage, are accepted only at owner’s risk and the warehouseman shall not be liable for any loss, deterioration, defrosting, damage, evaporation, shrinkage or change of color, brought about by any cause such as, but not limited to: Change in temperature or humidity through the process of cooling, freezing, storing, or removing merchandise from storage.”
Mr. Robert C. Warren, who was at the time of the trial Chairman of the Board of the plaintiff corporation, while denying yams are a perishable commodity, did admit they were susceptible to damage through temperature changes. In seeking to overcome the terms of the warehouse receipt, plaintiff attempts to state there was an agreement between the plaintiff and defendant that the yams were to be stored at zero temperature. This contention is based on the direct testimony of Mr. Warren, and of Mr. James R. Carpenter, the President. However, an examination of the testimony of both Mr. Warren and Mr. Carpenter does not show a formal agreement or specific request for zero degree temperature. Mr. Warren testified only in a general way they had contracted for zero degree temperature, but when asked by counsel for plaintiff whether he *257 recalled the conversation with Mr. Mal-bin, President of defendant corporation with whom negotiations were made, he could only answer they had discussed the matter about six months before storing the product in defendant’s warehouse, but he had forgotten the extent of the conversation, or what had been said, and stated only that they had agreed on storage for frozen merchandise. He further testified he had not discussed with Mr. Mal-bin the unique character of the product, and there is nothing in the record to indicate Mr. Warren had discussed directly with Mr. Malbin the need for maintaining the product at zero temperature. Mr. Carpenter, while testifying he had no reason to doubt Mr. Malbin had a zero degree warehouse or that Mr. Malbin stated he could store the merchandise at zero degree temperature, when asked by the Court:
“Q: I understand that but what I meant, in other words if you have a product such as this, did you go to your friend (Mr. Mal-bin) and say ‘Now, look this— by all means — you have got to keep below zero ?’ ”
he answered:
“A: I didn’t say that because it was standard warehouse procedure to maintain zero.”
Mr. Carpenter testified he had never written a letter to Mr. Malbin concerning specific instructions as to the temperature the yams should be kept, although he did testify that in the past his company had sent letters to warehousemen giving instructions in connection with the storage of their products.
The plaintiff makes much of the fact the packages contained instructions to “Keep at Zero Degrees or Lower”, however, the printing of such instructions on the box would not indicate an agreement, or obligation on the part of the defendant to maintain zero degree temperature. It was brought out during the examination of Mr. Warren that the Hammond Packing Company, a wholly owned subsidiary of the plaintiff Arkansas Frozen Foods, Inc., also issues non-negotiable warehouse receipts containing the same limitation of liability as set forth in the warehouse receipt issued by Your Food. He further admitted the yams were susceptible to temperature change, which language is also in his own company’s warehouse receipts, and such products are accepted in general storage only, at the owner’s risk. He further admitted all prudent warehousemen have such clauses in their receipts, although warehousemen do not always enforce that clause as plaintiff has collected claims from other warehouses.
It is thus clear from the evidence that Mr. Warren is familiar with the warehouse business, he did have knowledge of limitations contained in warehouse receipts, and he could well have protected himself against loss through temperature change by specifically contracting with the defendant in that regard.
An examination of the record clearly shows the Trial Judge was correct in finding no contract for zero degree temperature was either entered into or requested of the defendant by the plaintiff and thus, there was no specific liability placed upon the defendant other than as set forth in the warehouse receipt and under the Louisiana Uniform Warehouse Receipts Act.
The Trial Judge found as a matter of fact the defendant did not maintain zero storage and some of the sugar triggering occurred while in defendant’s plant, but held plaintiff had failed to prove “any lack of ordinary care on the defendant’s part from that routinely given its frozen product and that of other customers.”
As already mentioned, the warehouse receipt contains a provision in connection with liability that “the responsibility of a warehouseman in the absence of written provisions is the reasonable care and diligence *258 required by law.” The appropriate statutory provision in regard to the liability of a warehouseman is set forth in LSA-R.S. 54:21, which reads as follows:
“A warehouseman shall be liable for any loss or injury to the goods caused by his failure to exercise such care in regard to them as a reasonably careful owner of similar goods would exercise, but he shall not be liable, in the absence of an agreement to the contrary for any loss or injury to the goods which could not have been avoided by the exercise of such care.”
and under LSA — C.C. Article 2937 as follows :
“The depositary is bound to use the same diligence in preserving the deposit that he uses in preserving his own property.”
Applying the facts as set forth in the record to the above cited provisions of law, we find the defendant corporation runs an established warehouse which meets the standards set forth by the Louisiana State Board of Health and the Louisiana State Warehouse Commission.
Mr. Donald W. Burris, an employee of Louisiana State Board of Health, testified that as part of his job he makes periodic examinations of Your Food’s warehouse, tests other products stored therein, and said:
“A: It is my duty on visits to the Goldhill Food Corporation (whose products are stored in the Your Food warehouse) to check the temperature of the storage in so far as it may affect the products that they are manufacturing when I am there, and the rooms where these products are have never failed to be in the range which we require.
“Q: What is the range that you require ?
“A: Zero degrees or thereabout. We allow them 5 degrees, more or less.
sj? its 5k # #
“Q: I understand that Goldhill has always had food products in this same room where the candied yams are stored, so you had been in that room before this controversy arose, hadn’t you?
“A: Yes sir.
“Q: But I mean have you had any reason to make any complaints to the State Board of Health about Your Food Processing?
“A: No, sir, I have had no reason so far.
“Q : And it is your duty, I understand you to say, to check temperatures ?
“A: In so far as they may pertain to that particular product which I am checking that day.”
Mr. Burris testified that among the products stored by Goldhill were waffles, onions, shrimp, chopped peppers, chopped onions, rolls and “a dozen different kind of different products”, all of which, according to his testimony were apparently stored properly.
Mr. Ruffin Guidroz with the Louisiana State Warehouse Commission, in charge of the New Orleans area which covers Ponchatoula and Hammond, Louisiana, and who is President of the National Association of State License Warehouse Departments, said that in the course of 22 years he had been in every warehouse in the State of Louisiana, and testified as follows in regard to the warehouse procedures followed by the defendant:
“Q: But with reference to efficiency, what have you found with reference to it?
“A: I have never found they have any troubles in the warehouse as far *259 as the operation of the cold storage plant.
“Q: Have you ever had occasion to report them to the Warehouse Commission for not keeping proper temperatures?
“A: Never sir”
******
“Q: Have you ever had any temperature complaints in connection with Your Food Processing and Warehouse Corporation?
■“A: No, sir. Every time I go into the warehouse to check the commodities that are in storage, I check the thermometers that are on the wall, and there is one in Mr. Malbin’s room that contains these particular commodities by the door and also the back door inside the warehouse, both of which are plainly visible to anyone who wants to look for them, and they are supposedly accurate. At least, it was mighty cold in there. They registered at one time 3 above, at other time — ”
He further testified that he was in the room where the yams were stored three times between February and June of 1960 and he checked the thermometer each time.
Mr. Randolph Trappy Jr., manager of B. F. Trappy & Sons, Inc., of Lafayette, Louisiana, manufacturer of candied yams, testified that his company had had candied yams in the warehouse of Your Food and had no claims to make against Your Food after withdrawing the same. The plaintiff objected to Mr. Trappy’s testimony on the ground the yams processed by his company were different from those processed by plaintiff. However, a difference in processing would not be relevant here as the issue at hand is the ordinary care of the customer’s product by a warehouseman.
The record discloses deliveries of yams were made by the defendant to the plaintiff on March 16, April 8, April 27, May 3, May 18, May 21, and June 8, without complaint. The record further shows that Morton’s Frozen Foods withdrew yams at various times which it had stored there without making any claim, though plaintiff maintained Morton’s was not happy with the storage of its sliced yams. Nevertheless, no claim by Morton’s was made nor did plaintiff offer any testimony by any representative of Morton’s in this regard.
The plaintiff introduced evidence to show variations in temperature in the warehouse of defendant and introduced testimony by Mr. Carpenter and a Mr. Graphia concerning icicles hanging from the ceiling and building up from the floor, which plaintiff claims was evidence of leakage. However, this testimony is contradicted by Mr. James T. Little of Pioneer Insulation Company whose depositions were taken on behalf of plaintiff. Mr. Little testified his organization had worked in the warehouse from July through September, and although he remembered signs of frost at the walls and ceiling, he did not recall seeing icicles. He said the defendant’s warehouse was a normal operation and he spoke from a great deal of experience having worked in many warehouses.
In addition, Mr. Oscar Vitter, Jr., an employee of the defendant, testified he believed the temperature would get as high as 10 degrees above zero at times.
Plaintiff also introduced evidence to the effect one of the doors to the warehouse was broken and would not properly close, and fresh unfrozen strawberries had been stored in the same room with the yams which would cause a rise in temperature. This is a disputed fact, however, as Mr. Ruffin Guidroz of the Louisiana State Warehouse Commission testified that the strawberries were not in the same room with the yams.
The testimony regarding the crushing and mashing of the cases is also conflicting. The plaintiff introduced evidence to show *260 the cases stored in the defendant’s warehouse when removed were crushed and this crushing could have been caused by formation of ice on top of the cases. Mr. Warren testified the crushing could have resulted from “getting soft due to lack of temperature.”
The defendant maintains if any crushing had occurred it was the result of the plaintiff’s own handling of the product before it was stored in the defendant’s warehouse. The record discloses the cases were placed upon the plaintiff’s own pallets at their plant, then taken to the defendant’s plant in the plaintiff’s trucks and all that the defendant’s employees did was to remove them from the truck with a fork truck and double stack them. The record further discloses that either prior to the storage or on the first load, Mr. Malbin had requested that the plaintiff bring two loads down and stack them in the warehouse to see if the product could be properly stored in that manner and both Mr. Carpenter, the President of the plaintiff’s corporation, and Mr. Malbin observed the stacking. James William Jordan, the plaintiff’s truck driver who went to the defendant’s warehouse to get the merchandise, testified he gave a clear grade ticket when receipting for the goods and did not indicate on the dray receipt that the cartons were leaking or damaged.
It should be pointed out that the record clearly shows the plaintiff’s product is unique and is unstable subject to temperature fluctuations and the boxes were stored upside down at the plaintiff’s instructions which placed the invert sugar on the bottom of the packages and against the cardboard, which is the only part of the package not wrapped in aluminum; the product contains an acid additive not customarily used in connection with packaging yams and there is evidence to the effect the cases were left in the sun on plaintiff’s own warehouse before being shipped by an unrefrigerated truck to defendant’s warehouse, all of which factors could have contributed to the damages to the product. The record further discloses the plaintiff had difficulty with the same product in warehouses in Arkansas and in North Carolina.
The Louisiana Courts have held a warehouseman is not an insurer of the goods deposited with it, but only has the duty to exercise ordinary care in the operation of his business. See Challenge Cream & Butter Association, Inc., v. Douglas Public Service Corporation, La.App., 132 So.2d 104. The Louisiana Courts have further held in the absence of any special contract or agreement on storage, the general laws of deposit and the equivalent common law rules governing bailment must govern and an interpretation of these rules requires of the depository the exercise of ordinary care. See Livaudais v. Lee She Tung, 197 La. 844, 2 So.2d 232; Dugan v. Central Storage & Trucking Co., La.App., 23 So.2d 634; Munson v. Blaise, La.App., 12 So.2d 623.
The Trial Judge, after taking all the testimony into consideration, concluded the defendant had exercised the ordinary care and diligence required by it under the jurisprudence in the operation of its warehouse and the plaintiff had failed to prove any lack of ordinary care from that routinely given its own frozen products and that of other customers, and stated:
“The warehouseman is not held to be insurers liability. The Court must find that only general cold storage was requested by the plaintiff and such was received. To increase the warehouseman’s degree of care, in the absence of knowledge of the unique character approaching perishability, or special contract calling for guaranteed zero storage, would here be tanamount to requiring the warehouseman to inspect the contents and makeu,p formula of all stored commodities and result in burdening him with an insurer’s liability.”
The Trial Judge also stated that in his opinion the plaintiff must have known it was receiving only general cold storage *261 from the defendant as the record shows the defendant’s own storage charges were 10 cents less than that charged by the Hammond Packing Company, the plaintiff’s own subsidiary. With this holding this Court is in agreement as to do otherwise would in effect be substituting its opinion for the factual determination made by the Trial Judge and in no way can be considered manifestly erroneous.
In regard to the plaintiff’s allegation of res ipsa loquitur the Trial Judge held the doctrine could not be invoked for want of plaintiff showing the damages complained of would not have been occasioned had the defendant used ordinary care in his management and control. This finding is correct.
The plaintiff in his brief makes much of the fact the President of the defendant’s corporation, Mr. Malbin, did not take the stand and cites numerous authorities to the effect that where one party testifies as to the details of the other and the other party remains silent and fails to take the stand it is a presumption that the testimony of the other party would be corroborative. Even applying this presumption we do not feel that it would change the result.
With regard to the question raised by the defendant as to the right of plaintiff to file suit in this matter since the warehouse receipt was in the name of the Citizens National Bank in Hammond, The First National Bank of Little Rock, and Morton’s Frozen Foods, it is apparent that the actual owner of the property was the plaintiff, Arkansas Frozen Foods, Inc., and the warehouse receipts were given for security for a loan. Therefore, the plaintiff should be treated as the owner of the material and the party who will bear the ultimate loss if recovery is denied. It is, therefore, the opinion of this Court that the plaintiff has a proper standing in this matter, is the real party at interest, and should bear the storage charge. In view of this, the decision of the Trial Court, insofar as the re-conventional demand against the Citizens National Bank in Hammond is concerned, is reversed. In all other respects the decision of the Trial Court is affirmed.
Reversed in part and affirmed in part.